United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 1, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 03-10660

---

RLI INSURANCE COMPANY,

Plaintiff-Counter-Defendant-Appellee,

versus

MAXXON SOUTHWEST INC, ET AL,

Defendants,

MAXXON SOUTHWEST INC; GYPSUM
FLOORS OF TEXAS INC; RAYMOND BREKKE;

Defendants-Counter Claimants-Appellants.

---

Appeal from the United States District Court
for the Northern District of Texas
(3:01-CV-2536-G)

---

Before GARWOOD, HIGGINBOTHAM, and SMITH, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Defendants-counter claimants-appellants Maxxon Southwest, Inc.

(MSI), Gypsum Floors of Texas, Inc. (Gypsum), and Raymond Brekke

---

[*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

(Brekke), appeal the district court's grant of summary judgment, holding that appellants are not entitled to a defense or indemnity under the umbrella liability policies issued to them by plaintiff-counter defendant-appellee RLI Insurance Company (RLI).  We affirm.

**Facts and Proceedings Below**

Maxxon Corporation manufactured a product known as "gypsum cement."  MSI, one of Maxxon's distributors, sold gypsum cement to approximately twenty dealers, including both Gypsum and General Supply.  Until July of 2000, Brekke owned (directly or indirectly) both MSI and Gypsum.

On April 1, 2000, RLI issued a Commercial Umbrella Liability Policy to Gypsum, which ran from April 1, 2000 to April 1, 2001; on April 1, 2001, RLI issued to Gypsum a renewal policy running from April 1, 2001 to April 1, 2002.  MSI and Brekke were listed as additional insureds on the supplementary schedules of each policy.

On December 20, 2000, General Supply filed an antitrust lawsuit (the underlying suit) against Brekke, MSI, and Gypsum (defendants, insureds, or appellants) in the Northern District of Texas.  General Supply alleged that the defendants violated the Robinson-Patman Act[1] by engaging in discriminatory pricing. Specifically, General Supply alleged that, at some point prior to

---

[1] The Robinson-Patman Act provides, in part, "[i]t shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . ." 15 U.S.C. § 13(a).

2

1996, MSI began its practice of selling gypsum cement at a cheaper rate to Gypsum than to General Supply and other dealers, thereby giving a competitive advantage to Gypsum.[2] In its suit, General

[2] General Supply's complaint alleged that MSI used three different price lists; the price list containing the lowest prices was made available only to Gypsum, and one other dealer in Denver, Colorado. The list with the mid-range prices was made available to General Supply and diverse other dealers. A third list provided other dealers even higher prices than those which General Supply was paying. General Supply alleged that this scheme was created by Brekke, MSI's president, to give Gypsum an unfair price advantage over its competition, including General Supply.

The complaint filed by General Supply – referred to therein as "Gensco" – included the following allegations:

"32. Upon information and belief, since at least 1996, MSI has had two or more price lists for sales of gypsum cement to its customers, including Gensco.

33. These different price lists are not based on the quality or quantity of the cement being purchased, but are rather based on the identity of the dealer purchasing the product.

. . .

37. Gensco will show that Brekke and MSI were giving favorable pricing to Gypsum Floors of Texas because such favorable pricing allowed Gypsum Floors of Texas to obtain a competitive advantage over Gensco, thus enabling Gypsum Floors and its owner, Brekke, to profit at Gensco's expense.

. . .

47. At tome time before 1996 and continuing through at least June 2000, MSI had three different price lists for each grade of its gypsum cement. . . .

48. Gensco was unaware of these disparate prices and different price lists until sometime in April or May 2000.

49. In addition to the different price lists, upon information and belief, MSI offered additional special, unpublished discounts to certain dealers, including Gypsum Floors of Texas, which further reduced those selected dealers' net wholesale price for the same materials Gensco was purchasing at substantially higher, un-discounted prices.

. . .

3

Supply sought treble damages, injunctive relief, and attorneys' fees.

The insureds tendered the defense of the underlying lawsuit to RLI under the RLI policies, and RLI accepted the tender of that defense, subject to a reservation of rights set out in their July 23, 2001 letter to Brekke. On November 30, 2001, RLI withdrew from the defense of the underlying antitrust lawsuit claiming that the insureds were not covered, and simultaneously filed this suit seeking a declaration that they had no duty to defend the Brekke

51. Upon information and belief, Gypsum Floors of Texas knew it was on the first price list and actively solicited and received substantially lower net wholesale prices from MSI than were offered to Gensco. Gensco asserts that Gypsum Floors of Texas intentionally and knowingly obtained said lower prices and higher discounts from MSI and MAXXON Corporation and used its wholesale price advantage to knowingly and successfully underbid Gensco on construction jobs both companies were attempting to acquire.

52. Upon information and belief, Defendant Ray Brekke, the president of MSI and owner of Gypsum Floors of Texas, intentionally and knowingly set up the discriminatory pricing schedules used by MSI with the purpose of allowing his dealer, Gypsum Floors of Texas, to gain a price advantage over Gypsum Floor's competition, including Gensco, and that pricing actually gave Gypsum Floors a price advantage as anticipated . . .

53. Defendants Brekke, MSI and Gypsum Floors of Texas thus engaged in an unlawful conspiracy to violate federal antitrust laws and to harm and disparage the business and economic well-being of Gensco to the benefit of the Defendants, including by unlawfully interfering in the present and prospective business relations of Gensco."

The underlying suit also names Maxxon Corporation as a defendant. Maxxon Corporation is not an insured (or additional insured) under either RLI policy.

4

defendants against the underlying antitrust lawsuit. The insureds responded claiming that RLI could not avoid coverage under its policies, and that RLI breached its duty to defend.[3]

Meanwhile, on November 19, 2001, the district court in the underlying antitrust lawsuit granted partial summary judgment to MSI, Gypsum, and Brekke as to a portion of General Supply's cause of action for price discrimination under the Robinson-Patman Act. The court ruled that because MSI, Brekke and Gypsum were "related entities" until July of 2000 when Brekke sold MSI to Maxxon Corporation, an entity unrelated to Brekke, there were no transfers that could be considered "sales" under the Robinson-Patman Act prior to July, 2000. Therefore, the court ruled, General Supply could only offer evidence of injuries occurring after July of 2000.

Without defense from RLI, General Supply and the defendants settled the underlying antitrust lawsuit in April of 2002. Under the settlement, Maxxon Corporation and Gypsum paid $600,000 to General Supply; Gypsum paying $300,000 of the $600,000 on behalf of itself, MSI and Brekke, in exchange for a release of all of the claims asserted against all of them in that litigation. In April 2002, the district court then entered an order dismissing the case as settled.

---

[3] The defendants subsequently amended their pleadings to seek an indemnification for $300,000 that they had to pay under the settlement (addressed *infra*), and damages under the Texas Insurance Code.

5

On September 23, 2002, RLI filed its motion for partial summary judgment, claiming that price discrimination did not fall within the coverage of its policy, and alternatively, that coverage under the policies was barred under the fortuity doctrine. The insureds cross-moved for partial summary judgment seeking a declaration that RLI was obligated to defend the underlying lawsuit, to indemnify the insureds for the settlement, and for breach of contract by RLI in failing to honor its obligations under the policies. The district court ruled in favor of RLI on April 22, 2003, determining that the fortuity doctrine, also known as the loss-in-progress doctrine, barred coverage for MSI, Gypsum, and Brekke, and therefore RLI owed no duty to defend or indemnify its insureds in the underlying lawsuit.[4] On May 1, 2003 the district court entered judgment in favor of RLI.

On May 6, 2003, the insureds then filed a motion for reconsideration and, in the alternative, a motion for new trial, asserting for the first time that the partial summary judgment ruling in the underlying lawsuit undercut RLI's fortuity defense.[5]

---

[4] The district court did not rule on whether there would have otherwise been coverage under the terms of the policy.

[5] Their claim was that based on the partial summary judgment determinative in the underlying lawsuit, before July 2000, there was no violation of the Robinson-Patman Act because MSI and Gypsum were, in effect, under sufficiently common ownership by Brekke, and therefore there were no "sales," for the purposes of the Robinson-Patman Act, between the defendants. Hence, they argued that the fortuity doctrine could not apply to the April 1, 2000 - April 1, 2001 policy because the only sales contrary to

RLI opposed the motion, urging, *inter alia*, that it raised for the first time facts and issues which should have been raised in opposition to RLI's motion for summary judgment.  In a one sentence order dated June 13, 2003, the district court denied the insured's motion.  On July 2, 2003, MSI, Gypsum, and Brekke appealed the order granting RLI's motion for partial summary judgment and denying their motion for partial summary judgment, as well as the order denying their motion for reconsideration and new trial.

**Discussion**

*1.  Standard of Review*

This Court reviews a grant of partial summary judgment *de novo* and applies the same standard as the district court.  *William v. Bramer*, 180 F.3d 699, 702 (5th Cir. 1999).  Because RLI filed its motion for declaratory judgment in federal court pursuant to diversity jurisdiction, Texas substantive law applies.  *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

*2.  The Fortuity Doctrine*

The district court held that coverage for the General Supply litigation, as well as the settlement arising therefrom, was precluded under the fortuity doctrine because the underlying antitrust claims constituted a "loss in progress."  The fortuity doctrine relieves insurers from covering certain behaviors that the

---

the Robinson-Patman Act would have occurred after June 2000, when that policy was already in effect.

7

insured undertook prior to purchasing the policy. "Because the purpose of insurance is to protect insureds against unknown, or fortuitous, risks, fortuity is an inherent requirement of all risk insurance policies." *Scottsdale Ins. Co. v. Travis Maintenance*, 68 S.W.3d 72, 75 (Tex. App.-Dallas [5th Dist.] 2001, pet. denied). Combining the priciples of "known loss" and "loss in progress," the fortuity doctrine holds that "[i]nsurance coverage is precluded where the insured is or *should be aware* of an ongoing progressive or known loss at the time the policy is purchased." *Id.* (citing *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App.-Houston [14th Dist.] 1995, no writ)) (emphasis added); *see also Burch v. Commonwealth Mut. Ins. Co.*, 450 S.W.2d 838, 840 (Tex. 1970) ("A person may not, with knowledge of a loss, transfer the risk from one company to another or make a contract by accepting a policy issued under such circumstances that he was under no obligation with respect thereto.").

If an insured knows, or should have known, at the time it purchased the insurance policy, that its current behavior is wrongful and could result in liability, it effectively removes the risk element inherent in insurance, and therefore a Texas court will not require the insurer to pay. *See Franklin v. Fugro-McClelland (Southwest), Inc.*, 16 F. Supp. 2d 732, 737 (S.D. Tex. 1997). Because the behavior that led to the underlying antitrust suit, price discrimination, allegedly originated well prior to

8

April 2000, the district court held that the fortuity doctrine barred coverage in the case *sub judice*.

## 3.  Arguments on Appeal

On appeal, the insureds argue first that the fortuity doctrine should not have been applied to them because there was no "watershed event" informing them that they were doing anything wrong.  They next claim that, in any event, they in fact were not doing anything that could have exposed them to liability before the April 2000 – April 2001 policy was in effect.  They base this latter contention on the unity of ownership reasoning behind the district court's grant of partial summary judgment in the underlying suit.  We address these contentions in turn.[6]

### A.  Watershed event

After the district court rendered summary judgment in response to RLI's motion, finding that the fortuity doctrine controlled, the insureds' only remaining defense appeared to be that the complaint in the underlying suit made no allegations that they received any pre-policy notice or had any independent knowledge that they were engaging in activities that would have exposed them to liability. *See, e.g., Franklin*, 16 F. Supp. 2d at 737 (Under the fortuity

---

[6] The insureds also make certain policy coverage arguments, asserting that the injuries alleged in the underlying antitrust suit, like price discrimination, should be covered under the RLI policy as a personal injury from, *inter alia*, "discrimination." We need not reach these questions as we affirm on the basis of the district court's opinion, namely on the fortuity doctrine.

doctrine, "[t]he relevant inquiry is whether [the insureds] knew at the time they entered the insurance policy that they were engaging in activities for which they could possibly be found liable."). It is undisputed that the insureds had not received a complaint from General Supply before the suit, or before the purchase of the original RLI policy.

However, the district court correctly pointed out that, when determining coverage under the fortuity doctrine, the key inquiry is not whether the insureds actually knew of the underlying loss or potential liability, but rather whether they knew, at the inception of coverage that they were "engaging in activities" which might reasonably be expected to expose them to or result in liability. *Franklin*, 16 F. Supp. 2d at 737. Here, the behavior began no later than 1996, four years prior to the initial purchase of the RLI policy, and the underlying suit alleges that Gypsum "intentionally and knowingly obtained said lower prices and higher discounts from MSI . . . and used its wholesale price advantage to successfully underbid Gensco [General Supply] on construction jobs both companies were attempting to acquire" and that the discriminatory prices were "intentionally and knowingly set up" by the insureds "with the purpose of allowing" Gypsum "to gain a price advantage over Gypsum Floors' competition, including Gensco, and that pricing actually gave Gypsum Floors a price advantage as anticipated" and that the insureds "engaged in an unlawful conspiracy to violate

10

federal antitrust laws and to harm and disparage the business and economic well being of Gensco to the benefit of" the insureds. These allegations sufficiently reflect that the insureds knowingly engaged in conduct which they knew and intended would economically harm General Supply and which they knew or should have known could reasonably be expected to expose them to legal liability.

On appeal, the insureds again focus on the scienter element of the fortuity doctrine, asserting that they did not possess the requisite knowledge that their behavior might give rise to liability. The appellants claim that, based upon analysis of a number of Texas cases, some sort of "watershed event" is required to give an insured sufficient notice that he or she is subject to potential liability arising out of actions prior to the issuance of a policy.[7] They note that typically, this event is the receipt of a demand or cease and desist letter from a plaintiff, or the filing of a lawsuit before insurance has been purchased.

Although they are likely correct in their assertion that most cases do in fact involve a "watershed event" of some sort, nowhere in the case law is there any statement that such an event is *required*. Rather, we consider whether the party knowingly acted in a manner in which it "'could possibly be found liable.'" *Matagora*

---

[7] The appellants describe a watershed event as "an event beyond everyday 'business as usual conduct,' [that] caused the insureds to cross the line from engaging in mere conduct to becoming aware that they were engaging in conduct for which they could be held liable."

11

*Ventures v. Travelers Lloyds*, 208 F. Supp. 2d 687, 691 (S.D. Tex. 2001) (quoting *Franklin*, 16 F. Supp. 2d at 737).

Moreover, we can point to at least one case, *Scottsdale v. Travis*, where the Texas Court of Appeals applied the fortuity doctrine in the absence of any watershed, or threshold, event. The appellants attempt to distinguish *Scottsdale*, claiming that in that case, "the insured's actions were so egregious that the court determined that the insured had, in effect, engaged in essentially fraudulent activities for which it knew it could be held liable." However, there was undeniably no threshold event; in that case, the district court looked to the allegations contained in the underlying complaint, and held that "because the petition alleges the acts involved were intentional[,] we are not persuaded that . . . there is no allegation that [insured] knew it was engaged in activities for which it could possibly be held liable." *Scottsdale*, 68 S.W.3d at 77 (internal quotations omitted). Because, as was the case in *Scottsdale*, the underlying complaint in the case *sub judice* informs the court as to whether the insureds possessed the requisite *mens rea*, and as above noted General Supply alleged that the defendants intentionally created their price discrimination regime for the purpose and with effect of gaining a competitive advantage over and harming General Supply, the district court did not err in applying the fortuity doctrine in the absence of a "watershed event."

12

### B. *Partial Summary Judgment and the lack of a "sale"*

Before their motion for new trial and to reconsider, the insureds had not mentioned the partial summary judgment holding in the underlying antitrust suit to the district court. Nor do appellants contend that before their motion for reconsideration they had made any assertion in the present case about common ownership or that because of common ownership their conduct prior to July 2000 was not such as to expose them to liability or to invoke the fortuity or loss in progress doctrine; and indeed the district court's opinion does not reflect that the insureds made any contention whatever with regard to common ownership. Rather, the insureds' main argument, excluding the policy coverage claims, was that there was no watershed event that could have given them warning.

It was in the defendants' motion for reconsideration, and in the alternative for new trial, that they first raised their underlying suit partial summary judgment order, in which the district court in the underlying action found that before July 2000, the defendants committed no anti-trust violations, as the sales to Gypsum were not in fact "sales" for purposes of the Robinson-Patman Act due to common ownership.

RLI responded to this contention, asserting that it was waived because it had not been raised earlier. The district court summarily dismissed the motion for reconsideration and new trial,

13

and does not appear to have considered the partial summary judgment ruling in the underlying suit.[8]  On appeal, the appellants assert that the application of the fortuity doctrine to them is inappropriate because in the underlying action the district court granted them "partial summary judgment[,]. . . determining that because of the unity of interest between the Insureds, no transfers could be considered actionable 'sales' under the Robinson-Patman Act."  RLI again retorts that the defendants' underlying suit partial summary judgment argument has been waived because it was not earlier presented to the district court, and the partial summary judgment had been issued some ten months before RLI's motion for summary judgment in this case was filed.

We find no error in the district court's decision to deny the motion for new trial and to reconsider.  Although the district court might have had discretion to consider the defendants' argument, though first raised in their motion to reconsider, it was not required to do so.  *See Simmons v. Reliant Standard Life Ins. Co. of Texas*, 310 F.3d 865, 868 (5th Cir. 2002) (noting that when responding to a motion for reconsideration, the court has discretion to reopen a case that has been closed and may change its

---

[8] The district court's order stated, "The defendants' motion to reconsider the memorandum order on cross motions for partial summary judgment, and in the alternative, motion for a new trial is DENIED."  Therefore, because it made no mention of the underlying partial summary judgment, we assume that it did not consider the argument.  Moreover, there had already been a final judgment issued in this case.

14

ruling on the merits).

Moreover, there was no reason for the defendants not to have raised the issue sooner, nor do they give any reason.[9] Therefore, the district court did not abuse its discretion. *See Rosenzweig v. Axurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003) ("a motion to alter or amend the judgment under Rule 59(e) 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'") (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).[10]

Under Texas law, the duty to defend is determined only by the pleadings and the language contained in the insurance policy. *See National Union Fire Ins. Co v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). Moreover, the loss in progress

---

[9] The underlying partial summary judgment order on which appellants now rely was entered on November 19, 2001, some 10 months before RLI filed its motion for summary judgment and over a year before the district court's grant of RLI's summary judgment motion on April 22, 2003.

[10] We also point out that the underlying partial summary judgment order was interlocutory at all times. Because the entire case was settled, no final judgment was ever entered, and RLI never admitted or agreed that there were no violations before July 2000 (nor did General Supply). *See Avondale Shipyards, Inc. v. Insured Lloyd's*,786 F.2d 1265, 1269-72 (5th Cir. 1986). Additionally, even if there was a unity of ownership between the insureds, there was another dealer, in Denver, that was also a recipient of the most discounted price list. The partial summary judgment holding has no effect on the sales between the insureds and other parties receiving discounted rates.

15

doctrine is also triggered by the allegations in the pleadings. *See Scottsdale*, 68 S.W.3d at 75. Here, an examination of the allegations in the pleadings, as well as a consideration of the general rule that parties are charged with knowing the law, reflects that the district court properly applied the fortuity doctrine to bar coverage. Because we affirm the district court on this ground, we need not address the appellants' other contentions.

## Conclusion

For the foregoing reasons, the district court's grant of summary judgment is

AFFIRMED.